# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-04-00240-CV

**Northwest Austin Municipal Utility District No. 1, Don Zimmerman, William C. Ferguson, and Alan R. Weiss, Appellants**

**v.**

**City of Austin; Mayor Will Wynn, Brewster McCracken, Lee Leffingwell, Mike Martinez, Randi Shade, Laura Morrison, and Sheryl Cole, in their Official Capacities as City Council Members, Appellees[1]**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT NO. GN203378, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING**

## O P I N I O N

Appellants Northwest Austin Municipal Utility District No. 1, Don Zimmerman, William C. Ferguson, and Alan R. Weiss appeal from the judgment against them in their suit to declare that an agreement executed by the District and appellees City of Austin and City Council members (collectively, "the City") is an "allocation agreement" under section 54.016(f) of the Texas Water Code and that the agreement violates section 54.016(f) by allowing both the City and the District to assess and collect their full rate of property taxes.[2] The trial court granted partial

---

[1] Current City Council members have been substituted for their predecessors. *See* Tex. R. App. P. 7.2(a) (automatic substitution when public officer is party in official capacity).

[2] Section 54.016(f) was added in 1979. *See* Act of May 25, 1979, 66th Leg., R.S., ch. 796, § 1, 1979 Tex. Gen. Laws 2026, 2026. The parties do not urge, and we do not find, substantive changes in the relevant sections of the water code. Accordingly, the current code is cited for convenience.

summary judgment in favor of the City, upholding the City's property tax levy and collection of taxes. Because we hold that the agreement is an allocation agreement as a matter of law, we reverse the district court's order in part and render summary judgment in favor of the District on this issue. However, because summary judgment is improper as to the parties' remaining declaratory claims, we reverse this portion of the judgment and remand for further proceedings.

## BACKGROUND

In 1984, real estate developer Nash Phillips/Copus ("NPC") purchased 2,348 acres in northwest Travis County, located in the City of Austin's extraterritorial jurisdiction. NPC petitioned the City for water and wastewater services and sought to create a municipal utility district[3] to provide water and wastewater services to the property, known as the Canyon Creek development. The City opposed the creation of the Northwest Austin MUD proposed by NPC, arguing that the City had recently approved a number of MUDs in its extraterritorial jurisdiction and expressing concerns that the proliferation of MUDs can have "a substantial impact on the City's fiscal integrity."

When a city denies a request to include land within its extraterritorial jurisdiction in a proposed MUD, the water code provides that authorization may be sought by petitioning the Texas Water Commission[4] without securing the written consent of the city. *See* Tex. Water Code

---

[3] A municipal utility district, or "MUD," is a political subdivision of the State with limited governmental powers related to the provision of water, wastewater, and drainage services. *See* Tex. Water Code Ann. § 49.211 (West 2008); *see also id.* § 54.012 (West 2002), § 54.201 (West Supp. 2008).

[4] The Texas Water Commission became part of the Texas Natural Resource Conservation Commission, now renamed the Texas Commission on Environmental Quality. For simplicity, all the variations of the entity will be referred to as the Commission.

2

Ann. § 54.016(b)-(d) (West Supp. 2008). Under these provisions, which apply "only to land within the extraterritorial jurisdiction of a city,"

> the commission shall allow creation or inclusion of the land in a proposed district upon a finding that the city either does not have the reasonable ability to serve or has failed to make a legally binding commitment with sufficient funds available to provide water and wastewater service adequate to serve the proposed development at a reasonable cost to the landowner.

*Id.* § 54.016(d). "The provisions of this section shall apply whether the land is proposed to be included in the district at the time of creation of a district or to be included by annexation to a district." *Id.* Any party may appeal the Commission's decision in district court. *Id.*

After the City refused to grant permission for the inclusion of land within its extraterritorial jurisdiction in the proposed district, NPC petitioned the Commission for authorization. Following a contested case hearing, the Commission granted permission to create three MUDs (Northwest Austin MUD Nos. 1, 2, and 3). The City then filed suit in district court to appeal the Commission's decision. While the City's administrative appeal was pending, NPC and the City resumed negotiations and ultimately reached a settlement regarding the creation of the Northwest Austin MUDs. The Austin City Council voted for the formation of the District on January 15, 1987, and confirmed its decision with the passage of Ordinance 870514-X on May 14, 1987. In addition to providing the City's "written consent to the creation of a district," *see id.* § 54.016(a) (written consent to be provided by resolution or ordinance), Ordinance 870514-X authorized the city manager "to execute, on behalf of the City, the Agreement Concerning Creation

3

and Operation of the Northwest Austin Municipal Utility District No. 1" (the "Agreement").[5] The Agreement states that the parties understand and acknowledge that "all the land to be included within the District is to be annexed for full purposes by the City prior to final action for creation of the District by the Commission." Under the Agreement, the City would provide retail water, wastewater, and drainage services to customers within the District, while the District and NPC would finance and construct the water, wastewater, and drainage infrastructure and facilities according to the City's development regulations; upon completion, the facilities would be owned, maintained, and operated by the City. The Agreement further provides, in section 7.2:

> It is understood and agreed by the parties hereto that the City shall have the authority to assess and collect ad valorem taxes at the City's full tax rate within the District as for any other property within the City of Austin and the District shall have the authority to assess and collect the ad valorem tax established by the District unless either the City or the District are prohibited by a court of law from assessing and collecting all or a portion of the City's or the District's ad valorem tax rate.

After the Agreement was executed, the City passed an ordinance to annex the subject property into the corporate limits of the city. Thereafter, the City filed the Agreement in district court, which remanded the petitions for creation of the Northwest Austin MUDs to the Commission for reconsideration. Among the changes agreed upon by the parties were the dissolution of the three existing MUDs approved by the Commission, the creation of two rather than

---

[5] The Agreement was initially entered into by the City and NPC in December 1987. The District, after it was created by order of the Commission the following year, approved and executed the Agreement.

three districts, and corresponding boundary changes. The district court issued an order approving the Agreement, settling the City's suit against the Commission.

The Commission created the District as an in-city MUD on March 16, 1988. A subsequent election confirmed the District's creation and authorized $21.1 million in bonds for the construction of water, wastewater, and drainage facilities. Under the water code, the District is required to levy and collect ad valorem taxes sufficient to pay for the debt services to these bonds. *Id.* § 54.601 (West 2002) (district board shall levy continuing direct annual ad valorem tax each year while all or part of bonds are outstanding on all taxable property within district in amount sufficient to pay interest as it becomes due, to create sinking fund for payment of principal or redemption price at any earlier required redemption date, and to pay expenses of assessing and collecting taxes); *see also id.* § 54.602 (non-exhaustive list of factors board shall consider in determining actual rate to be levied each year). In reviewing the bonds, the Commission found that "the creation of the District will not unreasonably affect total tax assessments on all land and properties located within the proposed District." The Commission further concluded that "all of the requirements of section 54.016 of the Texas Water Code, as amended, have been fully complied with, met and accomplished."

In September 2002, the District and various individual homeowners filed suit challenging section 7.2 of the Agreement. They sought declarations that (1) section 54.016(f) of the water code prohibits the City from charging its full tax rate to the residents of the District, and (2) the residents' continuing duty to pay taxes to the District to retire the debt incurred by the District requires the City to reduce its own tax rate imposed on the residents of the District. In the District

5

and taxpayers' view, the Agreement is an "allocation agreement" within the meaning of section 54.106(f), requiring the Agreement to ensure that "the total annual ad valorem taxes collected by the city and the district from taxable property within the district does not exceed an amount greater than the city's ad valorem tax upon such property." *See* Tex. Water Code Ann. § 54.106(f)(2). The District and taxpayers also sought injunctive relief from the "illegal and excessive" taxes imposed by the City, as well as attorney's fees and costs.

By counterclaim, the City sought its own declaratory judgment that the Agreement is not an "allocation agreement" under the water code, that section 54.016(f) is not applicable, and that the District had breached the Agreement by seeking to declare section 7.2 invalid. Alternatively, if the court found that the Agreement was subject to the requirements of section 54.106(f), the City sought a declaration that the water code provision was null and void "to the extent it reduces the amount of the City's property taxes owed by the residents of the District or grants them an illegal tax exemption from the payment of the City's property taxes." The City also asserted a number of affirmative defenses against the District's claims, including laches and the statute of limitations, and filed a plea to the jurisdiction on the basis that the plaintiffs lacked standing and the City had not waived its immunity from suit for what was, in essence, a breach of contract claim.

The parties filed cross-motions for partial summary judgment on the merits. The trial court denied the District's motion for partial summary judgment and granted partial summary judgment in favor of the City, finding that the District's claims are barred by the statute of limitations and laches and declaring that the Agreement between the City and the District is not an "allocation agreement" under section 54.016(f) of the water code. The trial court made further declarations that

6

(1) the City's property tax levy was valid under the Agreement and property taxes were properly collected from residents of the District under the Agreement, and (2) section 54.016(f) of the water code does not create a tax exemption under the Texas Constitution. The trial court also granted the City's plea to the jurisdiction with respect to the individual plaintiffs for lack of standing, denied the City's plea as to the District,[6] and granted the City's motion for partial summary judgment on attorney's fees, creating the final judgment from which the District and taxpayers now appeal.

## STANDARD OF REVIEW

The propriety of a summary judgment is a question of law that we review de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id.* When both parties have filed motions for summary judgment and the district court grants one motion and denies the other, the reviewing court looks to the summary judgment proof presented by the parties, determines all questions presented, and if the reviewing court determines that the trial court erred, renders the judgment that the trial court should have rendered. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000); *Commissioners Court of Titus County v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997). We affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 157 (Tex. 2004).

---

[6] The City does not complain on appeal about the denial of its plea to the jurisdiction as to the District.

**DISCUSSION**

The District[7] brings five issues on appeal. In its first issue, the District argues that the Agreement is an "allocation agreement" subject to the requirements of section 54.016(f) of the Texas Water Code, mandating that the City reduce the ad valorem tax rate it charges taxpayers in the District. The District's second issue asserts that, contrary to the City's counterclaim, section 54.016(f) does not create an unconstitutional tax exemption. In the District's third issue, it argues that neither the statute of limitations nor laches bars the District from obtaining a declaration of its rights. The District asserts in its fourth issue that the individual homeowners have standing to challenge the consent agreement between the City and District to obtain a declaration of their rights, and therefore the district court erred in granting the City's plea to the jurisdiction with respect to the individual plaintiffs. Finally, in its fifth issue, the District argues the award of the City's attorney's fees should be reversed because it is "inequitable and unfair."

*Nature of the Agreement*

In its first issue, the District asserts the trial court erred in finding that the Agreement between the District and the City is not an "allocation agreement" under water code section 54.016(f) and that section 54.106(f) does not apply to the Agreement.

Whether the Agreement is an "allocation agreement" is a legal question that we review de novo. *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008). In construing

---

[7] As do the parties in their briefs, we will refer to the appellants collectively as "the District," apart from where the applicable law requires us to distinguish between the claims brought by the MUD and the individual plaintiffs.

8

statutes, we ascertain and give effect to the legislature's intent as expressed by the language of the statute. *Id.*; *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). We use definitions prescribed by the legislature and consider any technical or particular meaning that the words have acquired. Tex. Gov't Code Ann. § 311.011(b) (West 2005). Otherwise, we construe the statute's words according to their plain and common meaning, *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004), unless a contrary intention is apparent from the context, *Taylor v. Firemen's & Policemen's Civil Serv. Comm'n*, 616 S.W.2d 187, 189 (Tex. 1981), or unless such a construction leads to absurd results, *University of Tex. S. W. Med. Ctr. v. Loutzenhiser*, 140 S.W.3d 351, 356 (Tex. 2004); *see also Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 177 (Tex. 2004) (noting that when statutory text is unambiguous, courts must adopt interpretation supported by statute's plain language unless that interpretation would lead to absurd results).

We presume that the legislature intended a just and reasonable result by enacting the statute. Tex. Gov't Code Ann. § 311.021(3) (West 2005). When a statute's language is clear and unambiguous, it is inappropriate to resort to rules of construction or extrinsic aids to construe the language. *Hughes*, 246 S.W.3d at 626 (citing *St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 505 (Tex. 1997); *Ex parte Roloff*, 510 S.W.2d 913, 915 (Tex. 1974)). We look to the entire act in determining the legislature's intent with respect to a specific provision. *See Taylor*, 616 S.W.2d at 190; *Wilburn v. State*, 824 S.W.2d 755, 760 (Tex. App.—Austin 1992, no writ). The legislature is presumed to enact a statute with complete knowledge of the existing law and with reference to it.

*See Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990); *Southwestern Bell Tel. Co.*

*v. Public Util. Comm'n*, 888 S.W.2d 921, 926 (Tex. App.—Austin 1994, writ denied).

Section 54.016(f) of the water code states:

(f) A city may provide in its written consent for the inclusion of land in a district that a contract ("allocation agreement") between the district and the city be entered into prior to the first issue of bonds, notes, warrants, or other obligations of the district. The allocation agreement shall contain the following provisions:

(1) a method by which the district shall continue to exist following the annexation of all territory within the district by the city, if the district is initially located outside the corporate limits of the city;

(2) an allocation of the taxes or revenues of the district or the city which will assure that, following the date of the inclusion of all the district's territory within the corporate limits of the city, the total annual ad valorem taxes collected by the city and the district from taxable property within the district does not exceed an amount greater than the city's ad valorem tax upon such property;

(3) an allocation of governmental services to be provided by the city or the district following the date of the inclusion of all of the district's territory within the corporate limits of the city;

(4) such other terms and conditions as may be deemed appropriate by the city.

Tex. Water Code Ann. § 54.016(f).

According to the District, section 54.016(f) defines an "allocation agreement" as any

contract that is (1) provided for by the city in its written consent to the creation of a district, and

(2) entered into prior to the district's first issuance of bonds or other obligations. Provided these

two conditions are met, the District asserts, the contract is an "allocation agreement" as a matter of

law and must contain the provisions set forth in the subsections (1) through (4) of section 54.016(f).

10

The City challenges this interpretation as being too broad because it mandates that "if any contract, of any nature" is entered into prior to a district's first bond issuance, then it is an allocation agreement. Citing various provisions within section 54.016 that purportedly authorize the execution of "consent agreements" and other contracts between a city and a district, the City asserts that the legislature did not intend to make every pre-bond contract between a city and a district an "allocation agreement."[8]  In addition, the City urges that the parties had "continuously identified" the Agreement as a "consent agreement" since the time that it was executed, characterizing the District's acquiescence to the use of this term as an admission against interest.  Moreover, the City argues, the Agreement cannot be declared an allocation agreement by this or any other court because, in the City's view, the legislature invested cities with the sole authority to decide whether an agreement is an allocation agreement.  Noting that section 54.016(f) begins, "A city *may* provide in its written consent," *id.* (emphasis added), the City maintains that there can be no allocation agreement without the express consent of the City, and that the evidence is undisputed "that the City made the choice not to enter into an allocation agreement" in this case.

Based on the plain language of subsection (f) of the statute and the overall statutory scheme created by section 54.016, we conclude that neither party's interpretation is entirely correct. It is true that the word "may" creates discretionary authority or grants permission or a power, while the word "shall" imposes a duty.  *See* Tex. Gov't Code Ann. § 311.016 (West 2005); *see also*

---

[8]  For example, the City argues that section 54.016(a), which requires that a city provide its written consent to the inclusion of land within a district, establishes the authority for a "consent agreement" to be entered into between a city and a district because the provision refers to the "restrictions and conditions" that a city can place on its written consent, thus implicating a pre-bond contract, or "consent agreement," between the parties.

11

*Southwestern Bell Tel. Co. v. Public Util. Comm'n*, 31 S.W.3d 631, 637-38 (Tex. App.—Austin 2000), *aff'd*, 92 S.W.3d 424 (2002). Therefore, we agree with the City that the statute invests cities with the power to decide if, when submitting their written consent to the creation of a municipal utility district, such a contract will be executed. However, in the event that a city's written consent does provide for the execution of a contract with a district specifically addressed to the allocation of taxes, revenues, and government services before the first issuance of bonds, the legislature has clearly expressed that such a contract is an "allocation agreement" and has declared that certain mandatory provisions must be included in the agreement. *See* Tex. Water Code Ann. § 54.016(f) ("The allocation agreement *shall* contain the following provisions . . . .") (emphasis added). While a city is not required to execute a contract in connection with its consent to the inclusion of land within a district in every instance, it is required to comply with subsection (f) when it is clear that the city, in submitting its written consent, will contract with the district to allocate the taxes, revenues, and governmental services between the two entities. Thus, the City is incorrect that the question of whether the Agreement is an allocation agreement is not subject to judicial review because the statute leaves the choice to execute such an agreement to the sole discretion of the City. It is plain from the statute that a city may only decide whether it will enter into an allocation agreement. The entirely different matter of whether a contract is an allocation agreement was settled by the legislature when it declared that a pre-bond contract between a city and a district governing the allocation of taxes, revenues, and governmental services is an "allocation agreement." *See id.*

Nor are we convinced by the City's contention that it may "enter into a contract with a district without following any of the requirements of § 54.016(f)" because cities are statutorily

12

invested with the authority to enter into contracts independent of the authority granted by section 54.016(f). The City's power to execute contracts—under the water code or otherwise—is not in dispute. Rather, the issue is whether the specific contract that the City entered into with the District is what the legislature has termed an "allocation agreement." Whether the City could have executed an agreement under a different provision in section 54.016 has no bearing on this analysis. Likewise, the fact that the parties might have referred to the Agreement as something other than an allocation agreement does not by itself control whether the agreement is, as a matter of law, an allocation agreement. Such an interpretation would read subsection (f) out of the statute entirely by allowing a party to avoid the mandatory provisions that must be included in an allocation agreement, simply because it calls the agreement something different or asserts that the agreement was entered into under different authority. Because we must give effect to all the words of a statute and avoid constructions that treat statutory language as surplusage, *see Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 580 (Tex. 2000), we must reject the City's argument.

Instead, we look to the statute to determine whether the Agreement is what section 54.016(f), by its plain meaning, defines as an "allocation agreement": a contract between the District and the City, provided for in the City's written consent for the inclusion of land in a district, that was entered into prior to the first issue of bonds, and provides (1) a method by which the District shall continue to exist following the annexation of its territory by the City, if the District was initially located outside the corporate limits of the City; (2) an allocation of taxes or revenues of the City or the District ensuring that the total ad valorem taxes collected by the City and the District from property in the District does not exceed the City's ad valorem tax upon the same

13

property; and (3) an allocation of governmental services to be provided by the City or the District following the date of the inclusion of all the District's territory within the corporate limits of the City. *See id.* § 54.016(f)(1)-(3).

Here, Ordinance 870514-X—the City's written consent for the inclusion of land in the District—states that "the City and the Applicant for consent to creation have negotiated a consent agreement." Then, in part one, the ordinance provides, "The City Manager is authorized to execute, on behalf of the City, the Agreement Concerning Creation and Operation of the Northwest Austin Municipal Utility District No. 1, attached hereto as Exhibit 'A'." The Agreement was executed between the City and the District prior to the first issuance of District bonds. Thus, the District argues, the Agreement is precisely the sort of contract contemplated by the statute because all of the "statutory prerequisites" are met. However, this does not end the inquiry; the terms of the Agreement must also reflect each of the substantive requirements mandated by the statute. The first requirement, that an allocation agreement include "a method by which the district shall continue to exist following the annexation of all territory within the district by the city," applies only if the district is initially located outside the corporate limits of the city. *See id.* § 54.016(f)(1). In this case, the area including the District was annexed into the City's corporate limits before the District was created, so section 54.016(f)(1) does not apply. The third requirement, that the agreement allocate the governmental services to be provided by the city or the district, *see id.* § 54.016(f)(3), is clearly met.[9]

---

[9] As the City acknowledges, the Agreement "identifies the responsibilities of each party" regarding the provision of water, wastewater, fire, police, EMS, drainage, park and facilities maintenance, and other municipal functions, and these responsibilities are also set out in other

14

The second requirement—the central dispute in this appeal—requires an allocation agreement to contain "an allocation of the taxes or revenues of the district or the city which will assure that . . . the total annual ad valorem taxes collected by the city and the district from taxable property within the district does not exceed an amount greater than the city's ad valorem tax upon such property." *Id.* § 54.016(f)(2). The District argues that the Agreement contains such an allocation provision, but that it allocates taxes in a way that violates the statute and must be simply amended to set forth a proper allocation. This provision, contained in section 7.2 of the Agreement, states that "the City shall have the authority to assess and collect ad valorem taxes at the City's full tax rate within the District as for any other property within the City of Austin and the District shall have the authority to assess and collect the ad valorem tax established by the District." Thus, the Agreement fails to allocate taxes in the manner required by the statute because it allows both taxing authorities to tax at their full ad valorem rate, without regard to the other entity's rate. An "allocation" is a "designation or apportionment for a specific purpose." Black's Law Dictionary 59 (7th ed.). The Agreement contemplates no apportionment of taxes between the City and the District, but it clearly designates the taxing authority of each party.

The question, then, is whether the parties could have executed an allocation agreement when the Agreement does not precisely track the language of section 54.016(f)(2). The District urges that we must interpret the Agreement as an allocation agreement in order to prevent

agreements and city ordinances. The City's point that the Agreement "is not an allocation agreement merely because it identifies the responsibilities of each party" is well taken; accordingly, it is only one factor we consider in light of the statute as a whole in determining whether the Agreement is what the legislature has defined as an allocation agreement.

the City from unjustly benefitting from its failure to comply with the statute at the District taxpayers' expense. As evidence that the legislature did not intend to allow the City to continue taxing District residents at its full ad valorem rate following annexation, the District cites the legislative history of section 54.016(f). *See Hearings on Tex. H.B. 1974 Before House Comm. on Natural Res.*, 66th Leg., R.S. (Apr. 18, 1979) (transcript available at Legislative Reference Library). House Bill 1974 was designed to allow a municipal utility district to continue in existence after being annexed by a city without forcing the city to assume the district's debt obligations, as was the case under the prior law when districts automatically dissolved upon annexation. *See* Act of June 13, 1979, 66th Leg., R.S., ch. 796, 1979 Tex. Gen. Laws 2026, 2026. Because the district would survive post-annexation, however, the taxpayers in the newly annexed district would remain subject to the water district's taxes in order to pay off the district's bonded indebtedness, and be forced to pay the city's ad valorem taxes; therefore, according to the testimony before the House committee, the allocation-agreement statute would need to ensure that the residents of a district annexed under the new law would not pay taxes any higher than what other citizens paid in ad valorem taxes to the city.[10]

---

[10] According to the bill sponsor,

> What [H.B] 1974 basically does is allow the city and a water district before the first bonds are issued to enter into an agreement with the approval of the [Commission] whereby the city, at some point along the way, can annex that water district but does not have to assume the bonds. The bonds will stay with the water district, and the people living in the water district will continue to pay their taxes to the water district and pay all the bonded indebtedness. But there has to be in the agreement that's approved by the State that the people will not pay taxes any higher than what already ad valorem taxes for all the other citizens in that given city.

*See Hearings on Tex. H.B. 1974 Before House Comm. on Natural Res.*, 66th Leg., R.S. (Apr. 18, 1979) (transcript available at Legislative Reference Library).

This concern is clearly reflected in section 54.016(f)(2), which seeks to prevent the total annual ad valorem taxes collected by a city and a district from exceeding the city's ad valorem tax upon such property.

The set of circumstances motivating the passage of House Bill 1974 and the resulting amendment to the water code is identical in this case, where the City has agreed to the inclusion of land in the District, annexed that territory, and now has taxing authority over residents who are also faced with paying the District's taxes. Just as the statutory scheme contemplates, the District is to continue in existence after its annexation into the corporate city limits. In conjunction with its written consent, the City executed a contract that largely complies with the statute, outlining the post-annexation relationship between the City and the District and spelling out the rights and duties of each entity, including an allocation of government services that each will provide. Although the Agreement does not apportion taxes between the City and the District in strict accordance with section 54.016(f)(2), it clearly addresses the taxing powers of both the City and the District and acknowledges that their respective tax rates may be limited by statute. An agreement such as this, which defines the post-annexation relationship between a city and a district and addresses each of the subject-matter components of section 54.016(f), must be construed as an allocation agreement in order to effectuate the legislature's intent. Where the parties enter into a contract that provides for the post-annexation survival of the District and the subject matter of the contract corresponds to the elements listed in section 54.016(f), that contract is an allocation agreement as a matter of law.

Therefore, in light of the history and purpose of the statute, and the fact that the Agreement substantially conforms with section 54.016(f), we hold that the Agreement is an allocation agreement and must be brought into conformity with section 54.016(f)(2).

*Tax Allocation Provisions*

The District further asserts that in order for the Agreement to comply with section 54.016(f)(2), it must be amended to require the City to reduce the ad valorem tax rate it charges District taxpayers. The Agreement currently provides that "the City shall have the authority to assess and collect ad valorem taxes at the City's full rate" and likewise that "the District shall have the authority to assess and collect the ad valorem tax established by the District." The Agreement permits such rates "unless either the City or the District are prohibited by a court of law from assessing and collecting all or a portion of the City's or the District's ad valorem tax rate."

Under section 54.016(f)(2), the Agreement must provide for an allocation "of taxes or revenues of the district or the city which will assure that . . . the total annual ad valorem taxes collected by the city and the district from taxable property within the district does not exceed an amount greater than the city's ad valorem tax upon such property." *Id.* § 54.016(f)(2). By the Agreement's own terms, the tax allocation provision in section 7.2 must therefore be severed and the parties must "immediately amend this Agreement" to conform with this Court's holding that section 7.2 of the Agreement violates section 54.016(f) of the Texas Water Code.[11]

---

[11] The Agreement provides, in relevant part:

Section 12.1. Severability. The provisions of this Agreement are severable and, in the event any word, phrase, clause, sentence, paragraph, section or other provision

18

The District asserts that requiring the City to reduce its tax rate is the only possible way to bring the Agreement into conformity with section 54.016(f)(2) because the District must maintain a tax rate sufficient to meet its statutory obligations. As discussed previously, the water code requires a district to collect ad valorem taxes sufficient to service its bond debt. *See id.* § 54.601. The District must have sufficient tax revenues to pay interest on its bonds as it becomes due, to create a sinking fund for the payment of principal, and to pay the expenses of assessing and collecting taxes. *Id.* However, the City points out that it also has bonded debt supported by tax revenues and other obligations under various statutes that are met with its tax revenues. Adopting the same rationale as the District, the City argues that its tax rate cannot be reduced because it too is statutorily required to tax at a rate sufficient to service its bonded debt and meet its own statutory obligations.

The statute itself does not explain how or at what rate the City's and District's taxes should be set, but provides only that there must be an allocation to ensure a specific result. Nor does the plain language of the statute signify an intent on the part of the legislature to mandate a reduction in a city's tax rate alone. As the City points out, the use of the phrase "taxes or revenues" suggests that the legislature could have anticipated other ways to comply with its intent to reduce the burden

of this Agreement, or the application thereof to any person or circumstance, shall ever be held or determined to be invalid, illegal or unenforceable for any reason, the remainder of this Agreement shall remain in full force and effect and the application thereof to any other person or circumstance shall not be affected thereby.

Section 12.2. Enforceability. In the event that the Commission or any court of competent jurisdiction determines that any provision of this Agreement is beyond the scope of the Texas Water Code, the City, NPC and the District agree to immediately amend this Agreement to conform to such ruling or decision.

on taxpayers through, for example, a revenue-sharing scheme. Given the statute's silence on the issue, we disagree that the water code requires that the City must reduce its tax rate by the amount the District charges, while the District is permitted to tax at its current rate, or even potentially increase its tax rate.

By the Agreement's own terms, the parties must negotiate an allocation of taxes or revenues between the City and the District and amend the Agreement so that it complies with section 54.016(f)(2), subject to review by the Commission. Therefore, we sustain the District's first issue in part, holding that the Agreement is an allocation agreement and that it must conform with section 54.016(f)(2) of the water code. However, we overrule the District's first issue with respect to its claim that the City is required to reduce its ad valorem tax rate by the amount of the District's rate and hold that the district court did not err in failing to declare that the City must reduce its tax rate.

### *"Tax Exemption"*

In response to the District's second issue, the parties address whether section 54.016(f) creates an unconstitutional tax exemption. The district court declared that section 54.016(f) "does not create a tax exemption authorized by the Texas Constitution so Texas Water Code § 54.016(f) does not require the City to exempt MUD residents from the City's ad valorem property tax." Essentially, the parties do not disagree with the trial court's ruling, but they apply different interpretations to the declaration. The District interprets the ruling to mean that, were this Court to hold that the Agreement is an allocation agreement, then the City would have to reduce the ad valorem taxes for District residents, and that reduction would not be unconstitutional.

20

Accordingly, the District agrees with the declaration that section 54.016(f) does not create an unconstitutional tax exemption. The City responds that the trial court properly declared that section 54.016(f) does not create a tax exemption authorized by the Texas Constitution, so section 54.016(f) does not require the City to exempt the District's residents from the City's ad valorem taxes. The City offers the following additional grounds to affirm the district court's order: (1) the City's taxes are legitimate taxes of an overlapping political subdivision; and (2) the City's and District's taxes are not "double taxation." The City further contends that if section 54.016(f) applies to the Agreement, then any forced reduction in City taxes would be unconstitutional.

We have held that the Agreement is an allocation agreement and therefore must comply with section 54.016(f), but that the statute does not necessarily require the City to lower its tax rate for property within the District. Therefore, the statute does not create a tax exemption because no property is made "exempt" from taxation. Our resolution of the District's first issue advances an interpretation of the statute that avoids any conflict with the constitution, *see* Tex. Gov't Code Ann. § 311.021 (West 2005), and renders it unnecessary to address the City's alternative grounds for affirming the district court's order. Because the district court correctly found that the statute does not create an unconstitutional tax exemption, we sustain the District's second issue and, having held that the statute does not require any reduction in City taxes, further hold that the water code creates no unconstitutional tax exemption.

21

*Standing*

Because it is dispositive of the District's remaining points regarding the individual plaintiffs, we next address the District's fourth issue asserting that the City's plea to the jurisdiction should not have been granted on the basis that these individuals lacked standing to sue. The District argues that the individual plaintiffs have a justiciable interest in the interpretation of the Agreement because the statute requires the Agreement to contain an appropriate allocation "exclusively for the benefit of those paying ad valorem taxes to both the city and the district," thereby conferring standing on the individuals as third-party beneficiaries of the Agreement.

There is a presumption against conferring third-party-beneficiary status on noncontracting parties. *South Tex. Water Auth. v. Lomas*, 223 S.W.3d 304, 306 (Tex. 2007); *MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999). In deciding whether a third party may enforce or challenge a contract between others, it is the contracting parties' intent that controls. *Lomas*, 223 S.W.3d at 306; *see also Corpus Christi Bank & Trust v. Smith*, 525 S.W.2d 501, 503-04 (Tex. 1975). The intent to confer a direct benefit upon a third party must be clearly and fully spelled out or enforcement by the third party must be denied. *MCI Telecomms. Corp.*, 995 S.W.2d at 651. A third party may only enforce a contract when the contracting parties themselves intend to secure some benefit for the third party and entered into the contract directly for the third party's benefit. *Id.*; *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002). To qualify as one for whose benefit a contract was made, the third party must benefit more than incidentally; he must be either a donee or creditor beneficiary. *MCI Telecomms. Corp.*, 995 S.W.2d at 651.

In this case, the Agreement provides for the construction, operation, and maintenance of water and wastewater facilities in the District funded by the issuance of District bonds that will be secured by the District's taxes and net revenues. The Agreement does not mention the District residents except as they are referred to as "the City's customers" for retail water delivery and wastewater services. In fact, the Agreement expressly declares that it is "for the benefit of the City, the District, and NPC, its successors and assigns, and shall not be construed to confer any benefit on any other party except as expressly provided herein." We conclude that there is nothing in the Agreement that would confer donee- or creditor-beneficiary standing upon the individual plaintiffs to seek a declaration of their rights under this Agreement. Therefore, the district court correctly determined that the individual plaintiffs lack standing to assert that section 7.2 of the Agreement violates the water code. *See El Paso Cmty. Partners v. B&G/Sunrise Joint Venture*, 24 S.W.3d 620, 626 (Tex. App.—Austin 2000, no pet.) (holding that person who is not party to contract does not have standing to challenge contract). The District's fourth issue is overruled.

### *Statute of Limitations and Laches*

In its third issue, the District asserts that neither the District's nor the individual plaintiffs' claims are barred by the statute of limitations or laches. Having determined that the individual plaintiffs lacked standing, we address these issues only as they relate to the claims brought by the District.

To be entitled to summary judgment on an affirmative defense such as limitations, the movant must conclusively prove all of the elements of the defense. *See University of Houston v. Clark*, 38 S.W.3d 578, 580 (Tex. 2000). Once the defendant has established a right to summary

23

judgment on an affirmative defense, the burden shifts to the plaintiff to present issues which preclude summary judgment. *Huckabee v. Time Warner Entm't Co., L.P.*, 19 S.W.3d 413, 420 (Tex. 2000); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979).  The City asserted in its motion that the District's claims "are barred by the two-year and/or four-year statute of limitations under Texas Civil Practice and Remedies Code §§ 16.003, 16.004, 16.051. The two-year statute applies to issues relating to the payment of taxes and the four-year statute relates to the actions relating to the Consent Agreement between the District and the City." *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 16.003, .004, .051 (West 2002).

The district court granted the City's affirmative defense that the District's claims are barred by the four-year statute of limitations, but did not specify whether it was granting the defense asserted under section 16.004 or 16.051.  However, the District did not assert any claims governed by section 16.004, so that section could not have provided a basis for the district court's ruling. *See id.* § 16.004 (four-year limitations period for specific performance of contract for conveyance of real property; penalty or damages on penal clause of bond to convey real property; debt; fraud; breach of fiduciary duty; suit on bond of executor, administrator, or guardian; and suit against partner for settlement of partnership accounts).  Therefore, summary judgment could only have been granted on the basis that the District's claims are barred by the residual limitations period of section 16.051. *See id.* § 16.051 ("Every action for which there is no express limitations period, except an action for the recovery of real property, must be brought not later than four years after the day the cause of action accrues.").

24

As we understand the City's pleadings, "the District's actions relating to the Consent Agreement" refers to the District's request for a declaration of its rights under section 54.016(f) of the water code. Because a declaratory judgment action is a procedural device used to vindicate substantive rights, it is generally governed by the statute of limitations for the legal remedy underlying the claim; consequently, to determine what statute of limitations should apply to an action for a declaratory judgment, one must look to the legal remedy underlying the cause of action. *See, e.g.*, *Transportation League, Inc. v. Morgan Express, Inc.*, 436 S.W.2d 378, 387 (Tex. Civ. App.—Dallas 1969, writ ref'd n.r.e.) ("the statutes of limitation do not apply to . . . a suit for a declaratory judgment, at least until the provisions of such are set in action by the actual occurrence of a controversy"); *Outlaw v. Bowen*, 285 S.W.2d 280, 284 (Tex. Civ. App—Amarillo 1955, writ ref'd n.r.e.) (holding same). Given that the only applicable limitations period pleaded by the City in this case is the residual four-year period under section 16.051, we must determine whether the City established as a matter of law that the District's suit was filed more than four years after its cause of action accrued. A cause of action accrues and the applicable limitations period begins to run when a wrongful act causes some legal injury. *S.V. v. R.V.*, 933 S.W.2d 1, 3 (Tex. 1996); *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 351 (Tex. 1990). Put another way, a cause of action accrues when facts come into existence by which a party knows, or should know, that it is entitled to seek a judicial remedy. *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex. 1990).

According to the City, the District's cause of action accrued on June 18, 1989, when the District board president signed the Agreement containing the non-complying tax allocation provision. Since that time, the City argues, the District board has known that its residents have had

to pay taxes to both the City and the District "at the full amount," citing evidence that from as early as 1991, District residents had complained to the board about double taxation and the board had discussed the problem of overlapping taxes with City representatives. The District counters that the underlying injury is not the parties' initial execution of an unlawful contract term, but the continuous and ongoing violation of a statute. Conceding that the City might be able to assert a limitations defense against the claims brought by the individual homeowners for taxes improperly collected more than four years prior to filing suit, the District maintains that it cannot be time-barred in its request for declaratory judgment to determine whether the Agreement is currently in violation of section 54.016(f) of the water code. In support, the District cites to cases where courts have held that the statute of limitations merely limited the number of years for which a plaintiff could recover damages for the payment of illegal fees and taxes, but did not bar the plaintiff from bringing suit to challenge the legality of the fee or tax. *See Bowles v. Clipp*, 920 S.W.2d 752, 759-60 (Tex. App.—Dallas 1996, writ denied) (in suit filed more than ten years after county order was implemented to allow collection of illegal fee, challenge to legality of order was not barred by statute of limitations, but recovery was limited to fees paid previous two years); *Bowles v. Reed*, 913 S.W.2d 652, 657-58 (Tex. App.—Waco 1995, writ denied) (holding same); *see also Dallas County Comm. College Dist. v. Bolton*, 89 S.W.3d 707, 721-22 (Tex. App.—Dallas 2002), *rev'd on other grounds*, 185 S.W.3d 868 (Tex. 2005) (adopting reasoning in *Clipp*); *City of Austin v. Austin Prof'l Fire Fighters' Ass'n*, 935 S.W.2d 179, 183-84 (Tex. App.—Austin 1996, writ granted w.r.m.) (fire fighters' suit for declaratory judgment that city's length-of-service policies violated statute, filed

26

19 years after change in policy, was not barred by limitations, but recovery under contract was limited to four years of longevity backpay).

The District also attempts to distinguish the unpublished decision from this Court relied upon by the City in its motion for summary judgment for the proposition that "limitations bars declaratory judgment actions seeking to invalidate 'illegal' terms of a contract." *See Beadles v. Lago Vista Prop. Owners Ass'n*, No. 03-02-00228-CV, 2002 Tex. App. LEXIS 7940 (Tex. App.—Austin Nov. 2, 2002, pet. denied) (mem. op., not designated for publication). In that case, Beadles, a property owner, filed suit for declaratory judgment against the property owners' association in 2000, seeking a declaration that the maintenance-fee assessments levied by the association were invalid. *Id.* at *2-3. His challenge to the validity of the fee assessments was based in part on his allegation that a 1992 amendment to the association's voting procedures violated the Texas Non-Profit Corporation Act, thereby rendering all subsequent actions of the association invalid, including the fee assessments. *Id.* at *3. The association asserted the affirmative defense of limitations, arguing that Beadles could not complain about changes made to the voting procedures more than four years after they were amended. *Id.* at *3-4. In defense to the statute of limitations, Beadles argued that the entire corporate structure of the association, after the 1992 amendment, constituted an illegal contract and, therefore, each vote taken by the association perpetuated the underlying cause of action and defeated the running of the limitations period. *Id.* at *8.

This Court rejected Beadles's argument that the 1992 amendment instituted an illegal voting mechanism in violation of the Non-Profit Corporations Act. *Id.* at *9. Therefore, we held that any complaint regarding the change in voting procedures "arose from the procedure

of amending and publishing them, which took place in 1992," more than four years before Beadles brought his complaint. *Id.* After this case was decided, Beadles again brought suit against the association, challenging the maintenance fees it assessed against him in the years since his first suit. *See Beadles v. Lago Vista Prop. Owners Ass'n*, No. 03-05-00194-CV, 2007 Tex. App. LEXIS 3861 (Tex. App.—Austin May 18, 2007, no pet.) (op. on reh'g) (mem. op., not designated for publication). In the second case, which was also appealed to this Court, we reiterated our previous holding that the voting structure was not illegal because it did not violate the Non-Profit Corporations Act and determined Beadles was barred by res judicata from bringing the same claim. *Id.* at *9-10. But we went on to state that "[i]f this Court had determined that the voting procedures were not allowed under the Act, we would have had to address Beadles's claim of a continuing breach that would have tolled the statute of limitations." *Id.* at *10.

Here, the District asserts essentially the same argument that Beadles had raised: because the tax-allocation provision of the Agreement violates the water code, there has been a continuing breach that tolled the statute of limitations, and thus the District's claim is not barred by limitations. We disagree with the City, however, that our decision in *Beadles* stands for a rule that a declaratory-judgment action will be barred by limitations "even when there [is] a 'continuing' violation of a state statute." On the contrary, we held that *because* there was never a violation of the statute in the first place, there was no continuing violation and therefore no basis for concluding that the statute of limitations had been tolled. In this case, however, we have determined that section 7.2 of the Agreement does violate section 54.016(f) of the water code. Therefore, as we would have in

28

*Beadles* if the voting procedures had violated the Non-Profit Corporations Act, we turn to the issue of whether there was a continuing violation.

In asserting that section 7.2 of the Agreement is in continuous violation of the water code, the District analogizes to cases involving challenges to the legality of municipal policies brought many years after those policies were adopted. For example, in *Haliburton v. City of San Antonio*, 974 S.W.2d 779 (Tex. App.—San Antonio 1998, no pet.), the court held that limitations did not bar police officers' claims against the city for failure to pay them in accordance with the statute during the period of limitations, even though the underpayment had continued for at least 25 years, because the continued underpayment represented a continuing violation of the governing statute. 974 S.W.2d at 783. Likewise, in *City of Austin*, this Court rejected an argument that the fire fighters' declaratory judgment cause of action arose when the city changed its policy and stopped including time spent in the fire academy as "service time" for purposes of determining longevity compensation. 935 S.W.2d at 183-84. We held instead that their claims were not barred by the statute of limitations even though they initially arose outside the applicable period. *Id.* at 184.[12] Similarly, the District argues that it should not be prevented from bringing its challenge to the legality of section 7.2 of the Agreement more than four years after that contract provision was adopted. We agree. Because the statute of limitations has not run on the District's underlying claim

---

[12] Moreover, there is also the line of cases dealing with contracts that contemplate continuing obligations, for which the rule is that limitations does not begin to run until: (1) the parties' obligations under the contract are complete; (2) the contract is terminated in accordance with its terms; or (3) the contract is anticipatorily repudiated by one party and this repudiation is adopted by the other party, whichever event is earlier. *See, e.g.*, *City of Corpus Christi v. Taylor*, 126 S.W.3d 712, 725 (Tex. App.—Corpus Christi 2004, pet. dism'd); *Hubble v. Lone Star Contracting Corp.*, 883 S.W.2d 379, 382 (Tex. App.—Fort Worth 1994, writ denied).

that section 7.2 of the Agreement is a continuing violation of the water code, the District's declaratory judgment action is not barred by limitations.

Nor did the City establish that the District's suit is barred by laches. Laches is an equitable defense akin to estoppel and requires a showing that (1) the suing party unreasonably delayed asserting his rights, and (2) due to the delay, the opposing party has made a good faith change of position to its detriment. *City of Fort Worth v. Johnson*, 388 S.W.2d 400, 403 (Tex. 1964). The record is devoid of evidence that the City has made any change of position due to the District's purported delay in seeking a declaration of its rights.[13] *See id.* at 403-04. Moreover, it is well-established that where a unit of government is exercising its governmental powers, it is not subject to the defense of laches. *City of Hutchins v. Prasifka*, 450 S.W.2d 829, 835 (Tex. 1970); *Capitol Rod & Gun Club v. Lower Colorado River Auth.*, 622 S.W.2d 887, 896 (Tex. App.—Austin 1981, writ ref'd n.r.e.). In *Capitol Rod & Gun Club*, this Court held that the LCRA, a political subdivision, could not be estopped from seeking a declaration of its rights under a contract pertaining to matters within the scope of its governmental functions. 622 S.W.2d at 896. Likewise, the District in this case seeks a declaration regarding its rights under an agreement that bears directly on the District's own governmental functions in its capacity as a municipal utility district and taxing entity.

---

[13] The City cites as evidence an affidavit from its utilities finance manager stating that the City has in good faith collected its full property taxes from residents of the District and has provided full municipal services to the area since 1989. Contrary to the City's assertion, this is not evidence of its change of position as a result of the District's delay in seeking a declaration that the ad valorem property tax allocation in the Agreement violated the water code. The City's argument presupposes that the appropriate relief to redress the District's delay would be a mandatory reduction in the City's tax rate; however, as has been discussed, the statute requires no such rate reduction that would support the City's laches theory.

30

We sustain the District's third issue in part, holding that summary judgment should not have been granted because neither limitations nor laches barred the District's claims against the City.

### *Attorney's Fees*

In its fifth issue, the District claims that the trial court erred by awarding attorney's fees to the City. Because we have determined that the trial court erred by declaring that the Agreement is not an allocation agreement, we reverse the trial court's award of attorney's fees to the City and remand this issue to the trial court to reconsider the parties' claims for attorney's fees. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 2008).

### CONCLUSION

Because we hold that the Agreement between the City and the District is an allocation agreement under Texas Water Code section 54.016(f) and that section 54.016(f) applies to this Agreement, we reverse the summary judgment in part and render judgment in favor of the District on this issue. Furthermore, because the District's suit for declaratory judgment was not barred by the statute of limitations or laches, we reverse this portion of the summary judgment and remand the parties' remaining declaratory claims for further proceedings consistent with this opinion. We conclude that the district court properly granted the City's plea to the jurisdiction as to the individual plaintiffs for lack of standing and affirm the district court's order dismissing their suit. In light of our disposition reversing the summary judgment in part, we reverse the award of attorney's fees to the City and remand the issue of attorney's fees to the trial court for further consideration.

31

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Puryear and Onion*

Affirmed in part; Reversed and Rendered in part; Reversed and Remanded in part

Filed:   November 14, 2008

---

\* Before John F. Onion, Jr., Presiding Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 2005).